Good morning, may it please the court. I'm Judith Hagley from the Department of Justice representing the Commissioner of Internal Revenue. We've argued in our briefs that... You're ordinarily up here saying the tax court got it right. We are. We rarely see you up here saying the tax court got it wrong. Tell us how they got it wrong. Tax court really got it wrong in this case. In our brief we explained that the tax court got it wrong under both the economic substance doctrine and under the substance of reform doctrine. What I'd like to focus on today is why the court got it wrong under the economic substance doctrine. The basis bump transaction which generated the artificial 37 million loss lacks economic substance as an objective matter because it was designed to generate wholly artificial loss. It was not designed to generate any economic benefit for the taxpayer. It's undisputed that this is a wholly artificial, purely paper loss and as the cases we've cited in our brief and taxpayer hasn't cited any cases to the contrary, artificial losses lack economic reality and are compelling evidence as the 10th Circuit noted in the Sala decision that a transaction lacks economic substance. Under the code only bona fide losses are deductible and a paper loss is not a bona fide loss. Moreover, the transaction also lacks economic substance as an objective matter because it wasn't designed to generate an economic benefit for the taxpayer. Now the tax court found that taxpayer intended to use the inventory and other operations during the bailment period but the transaction was not designed to satisfy that subjective intent. Under the bailment agreement, CMAQ could not and did not use the inventory during the bailment period. The parties stipulated and the tax court found that the bailment agreement provided that the inventory was to be kept, maintained and used by Nortel pending the closing. The parties that signed the bailment agreement understood that the period and in fact Nortel used essentially all the inventory, 12 million dollars worth of inventory during the bailment period. It was constantly creating frames during the three or four weeks in July that can constitute the bailment period and it needed constant access to that inventory which is why it was important that the bailment agreement precluded CMAQ from possessing or controlling the inventory. Now the bailment agreement did give CMAQ the right to transfer legal title and to pledge the inventory which was essential for the tax strategy in this case but pledging the inventory did not provide CMAQ an economic benefit because it had financing for this transaction without the pledges. The tax court itself found that the transaction was financed, the Creedbor acquisition was financed through pre-existing credit lines that we've cited from the lenders make clear that the pledge was done to for tax purposes only not for business purposes and the pledge itself lacked economic reality. We're talking about 13 million dollars worth of inventory securing a 52 million dollar loan and you know be as if you wanted to buy a hundred thousand dollar house. Yes your honor. It wasn't illegal. No. And was within the law. It was not illegal and that was another error the tax court made. It suggested that the fact that these were valid legal transactions somehow meant they had economic substance. Well he noted it. Did he rely on that? I don't recall that he relied on it. I think he said they were within the law and then further I think they have economic substance and an economic purpose. He found both on both basis and I think he could have just done one. He found out both and I questions regarding the bailments but he didn't just solely rely on the bailment agreement did he? Well the tax court the critical error that the tax court made is it didn't rely on the bailment agreement that failed to test the purported intent that CMAQ had to use this inventory during the bailment against during the bailment period failed to test that against the objective evidence. The tax court said that the only thing that matters is intent. And that's just wrong as a matter of law. Intent is not dispositive. As an objective matter the transaction is not providing an economic benefit for the taxpayer. It lacks economic substance. And a clear example of this we cited several on a case is the Coltec decision. In that case the tax the Court of Federal Claims the trial court had found that a transaction had economic substance. On appeal the Federal Circuit reversed because even though the CEO of the company had said we are engaging in this transaction for a business purpose my intent is to protect my company from bail piercing. On appeal the Federal Circuit said we're looking at the documents we don't see how this could protect you from bail piercing. We don't have to determine whether your motive your sole motive was was tax motivated. Let me make sure I understand because the time is really limited but did the tax court find that the inventory transactions had at least two non-tax business purposes? I think it said it provided for part of the capitalization of CMAQ network systems and two it also enabled the Creedmoor business to be operated as a separate subsidiary of Canadian Parents Consolidated Operating Group. We're I think our a lot of deference sure is that you know and that deference is it I mean is that illogical implausible or without support in the record? I don't think it's is it disputed that network needed the inventory to operate the Creedmoor facility? That's not it that network did need the inventory and the tax court found made two findings said that the CMAQ engaged in this transaction to provide network the capitalization to purchase Creedmoor and also engaged in this transaction to allow network to operate as a separate subsidiary and both of those findings they're not supported there's no evidence in the record demonstrating that was in fact the motivation and two even if there was evidence in the record demonstrating that CMAQ was motivated by those purposes it would conflict with the objective evidence. With the objective evidences which we cite in our opening brief and taxpayer has not disputed is that CMAQ was incorporated as a separate subsidiary on May 28th before the inventory before the basis bump transaction took place and CMAQ got the funding to purchase Creedmoor from a separate subsidiary from CMAQ general partnership. Well and that's the way it was structured right it seems like the way the transaction was was structured holdings CMAQ's which is I guess the holding company right CMAQ's holding company in America owned a hundred percent of network at the conclusion of the transaction which I think means the Creedmoor facility could be operated under holdings umbrella just as CMAQ's other American subsidiaries were. Network is a wholly owned subsidiary by Network is a wholly owned subsidiary of holdings before the inventory was transferred to network. It was incorporated May 28th and there's evidence the record that holdings was the sole owner before the transfer to network that wasn't necessary that was done solely to generate the artificial loss. Well let me ask you about the the inventory transactions and whether or they lack economic substance because you know CMAQ could and did use the inventory is that true? No CMAQ did not use inventory during the bailment period. Well it didn't interconnect sold a portion of it sell a portion of its inventory to courts and the inventory was available for use at least that's exactly what that's what the tax court found I'm trying to find out from you because this is your time why that was illogical. The tax court did find that there was a sale and there was a paper sale of the inventory to network but the I'm sorry to courts in the UK but it was only a paper sale because the inventory remained at all times under the control of Nortel at the time of the physical inventory which took place at the closing on July 24th that inventory that on paper had been sold to courts still remain within Nortel's possession and control and that makes sense it lied the bailment agreement which excluded CMAQ from having the right to transfer use or possession of the inventory and in fact that the closing had not taken place all CMAQ's rights in the inventory would have we returned to Nortel and Nortel would return the purchase price. But but didn't hold I thought holdings contributed to networks capital by transferring the inventory to network that is what the tax court said but it's hard to see how transferring 12 million dollars worth of inventory that's burdened in debt it all contributes to networks capital. It didn't and the tax court was talking about the capitalization this is evident on page 20 of excerpts of record was talking about capitalization to purchase Creedmoor and it's undisputed and the court found. But didn't Dennis wasn't there a testimony by Dennis Wood on this particular subject? What Dennis Wood said is is this transaction was brought to him by his senior management as a tax motivate you know for tax advantages and he said he approved it because it wouldn't hinder the closing and he said that we could use the inventory. He conceded on cross-examination however that during the bailment period Nortel would continue to use the inventory. So his testimony does not explain. But doesn't Nortel's vice president of materials he testified I think that CMAQ wanted the inventory early so it could use the materials at its Harlow facility. Is that we're not the tax court was wrong in crediting that? But yes because under the bailment agreement this is where the tax court erred is it failed to test the intent against the objective evidence and what the objective evidence is is a under the inventory. It had rights to transfer title but it couldn't use the inventory and in fact did not use the inventory during the bailment period. But I thought they sold $279,000 worth of the inventory to courts was it courts? That is correct which was in Harlow that's the same group in the UK but that was a paper sale of an insignificant amount and by paper sale I mean they never actually acquired during the bailment period the inventory to use in their operations. They were precluded by the bailment agreement to use that inventory during the bailment period. If the closing happened the inventory would have to go back to Nortel and under the physical inventory that took place at the closing courts did not have that inventory. It was still under its Alston facility. But isn't there support in the record though that both CMAQ and Nortel wanted the inventory purchase to occur before the Creedmoor facility purchase? Did you say that Nortel wanted to because Nortel resisted it. Nortel didn't want to do it at first because it was going to create complexities but once the bailment agreement was put into place which essentially preserved for Nortel its use in possession of the inventory it agreed to go forward with the advanced inventory purchase. Okay. All right. You want to save the rest? I'd like to save the rest. Thank you. Good morning Your Honor. I'm William A. Schmaltzel representing Flextronics in this case. The first thing I would like to address given the discussion that we've been having is that the government as with many things here just wants to have the parts of the record that they think supports their position. The bailment agreement also provided in section 6 which is at ER 312 that there could be transfers of title to other CMAQ affiliates. There was also testimony by Mr. Hewitt who was the point person for the Nortel portion of the agreement that he understood that the inventory was being purchased by CMAQ because they could use it at other locations particularly Harlow. This is at SER 28 and 29. There is documentation in the record as well of the bill of sale. There's an internal memorandum from CMAQ indicating that they had a need for this inventory at Harlow dated I believe July 2nd. There is a shipping invoice that is on Nortel documents because at this time CMAQ did not have a facility in North Carolina saying that the inventory should be shipped to England. There is further evidence that the inventory went to Alston Avenue which Mr. Hewitt testified was the location within Nortel that they used for international shipments because international shipments required a special documentation. Didn't the accountants have some reservations about this transaction? I'm sorry which aspect of the transaction are you talking about? The entire transaction. What do we do with some of the most interesting things in litigation are often emails. What do we do with emails like the one at ER 218? Clearly the only reason we are doing this is to get a 357 C bump up. Your honor I believe that there is a basic misunderstanding of KPMG's role in this transaction. What was their role? They gave tax advice but that was only a very limited access to the people at CMAQ. None of the emails that you have in the record are between anyone at CMAQ and anyone at KPMG. They do evidence though don't they that the accountant said we're asking what's what's the business purpose? We don't see a business purpose. I'm paraphrasing. They show the person who's writing that email at that time did not know but I have no evidence and there's none in the record that indicates that person ever could talk to Dennis Wood, ever talked to Monsieur Collier. The only person that I have record evidence that before the closing on the inventory ever actually talked to CMAQ is Mr. Lacroix, the relationship partner up in Canada. It's extremely limited as to what the actual personal knowledge of any of these people were. It's also unclear as to what at that time people thought was required for the business purpose. In fact that is still an open issue today I would say in the Ninth Circuit as to whether or not the business purpose for the overall Creedmoor transaction was by itself enough to justify all of the subsequent transactions that were taken in furtherance of that basic objective. You have to remember while the Coltec case is referenced as being this standard about looking for parts of the transaction, that case did not come up until 2006. We're talking about in 1998 and I believe at that time most practitioners would have been quite comfortable in saying you're buying a business which is essential for the growth of your company and if you lose it, you lose the very 50% of your US business, that they would conclude that you were entitled in furtherance of that transaction to select the steps that were most advantageous to you as long as they in fact furthered the transaction. And so you know I'm not sure what KPMG actually thought the business purpose level was needed. They certainly were planning to go ahead with the inventory before they ever developed evidence that there was a purpose for having the interim purchase of the inventory and they seem to be quite content to go ahead even without that piece of it. So I believe that the you know that they my main point though is I don't know that they ever talked to Dennis Wood. They may not have known at that point in time but when Dennis Wood was asked he basically evaluated the transaction and I think his testimony is extremely believable that he understood that he could use this inventory at various locations around the world. He thought that it would fit in with his overall business purpose therefore he was willing to approve the transaction because he thought it furthered his overall objectives. Now the fact that he didn't run off and tell the accountants everything he was doing is you know I don't think he felt that he had any obligation to talk to the accountants and there were a lot of other issues going on. I mean there's extensive testimony from Sue Gunther who was the lead person on sort of the day-to-day aspects of the Creedmoor acquisition that there were significant issues with what the employment who they were going to take on who was on medical leave what they were going to do with the IT system what we're going to be the agreements with respect to the overall pricing of the supply agreement there's all this is going on you've got these few people at KPMG who are worried about the tax aspect and yes they don't know everything that is in Mr. Woods mind but again we have no way of knowing who the authors of those emails talked to what they were relying on. Let me ask you a question you know the tax court concluded that one of the business purposes of the inventory transaction was to provide part of the capital network needed to run the Creedmoor facility I asked your opposing counsel I think about this and and the inventory worth 13 million and subject to 15 million liability could in no sense add to networks capital I guess what's your best response to this point? Well let me address the second point first you have to remember that the loans to which that without to which the inventory is subject are also fully recourse loans to the Canadian entities that did the borrowing it is true that there is also a lien placed upon the inventory for the full amount of those loans one thing I've noticed in preparing for this some people aren't aware I mean it is subject to the full amount if the Canadian companies had paid off 40 million of the loans and they failed to pay off the last 11 million the inventory could still be seized so now I will admit that if you get inventory that is subject to a lien and if your parent does not pay off the loan you are at risk of losing that but as long as the parent company pays off the loan the inventory is perfectly good you can use it in your day-to-day operations it is subject to a lien and you are at some risk so it is less valuable than if you had gotten the contribution with no strings attached but it did enable the company to have property that on a day-to-day basis it could use the other part of your question comes to an issue which I don't really understand the government's point they keep coming back to the fact that network was incorporated yes there was a filing of papers by one of these services corporate creations who will set up a you know a shell corporation for you but being a shell corporation does not provide capital the loan that was made and as the tax court found at er 11 was only for 43 million dollars so if you only had the loan that was made to network network would only have 43 million dollars and that would not have been enough to purchase all of the assets for Creedmore the way in which it obtained the other assets were the fact that interconnect made a contribution to holdings took back shares of holdings a very significant share of the US group that became a 33% direct donor of the US group holdings in turn contributed the inventory down to network and that provided the other piece of what network needed for the assets that it was going to have to go forward in its operations so without doing this capital contribution under the facts of what actually happened network would not have all of the necessary assets so I mean this definitely provided part of the capitalization of the end operating company I don't see really any reason why the tax courts conclusions of that are not fully supportable so on the economic benefit and economic purpose you submit the tax courts justification was enough I believe it is perfectly enough your honor I mean the company is purchasing inventory that there is clear evidence that it could use in multiple locations it had it bought by a Canadian company that had resources I mean it's important to keep in mind here this is a Canadian based company most of the assets credit relationships are in Canada not in the US and so if you wanted to buy the inventory at that time interconnect had the wherewithal to do it it did not make you could structure other transactions but that's having the government be able to dictate the terms on which the transaction will occur I mean there certainly are many ways that you could have gone from the fact that Canadian parent signed the contract with Nortel and everyone agrees that Nortel demanded that that contract be at the Canadian parent level to going to having an operating company that does the day-to-day operations but there are countless ways you could have done that I mean Canadian parent could simply have bought all the assets itself and operated as a US branch you know they could do they you know what they did here they made partial loans they made partial capital contributions but that is the taxpayer taking the opportunity in the context of what's undisputably a legitimate business transaction the acquisition of Creedmoor and deciding how they will best effectuate that and that has always been the black letter law that if a taxpayer has a legitimate transaction they are free to arrange their affairs in the way that optimizes the tax treatment this case goes completely against it it says if you were going to buy Creedmoor there's one and only way you can do it you have to network purchase it at a single time they don't get into the details whether it had to have cash for a loan whether it had to have capital but they want to dictate the one part of where it is I mean we all make many choices and tax is part of that but whatever happened here CMAQ was doing something that was essential I mean they clearly needed the inventory they clearly needed a loan they clearly needed to have a vehicle in which they were going to operate it they just chose a particular route and the government doesn't like the route we chose but there's nothing that we bought nothing that we borrowed that we didn't need we just chose out of the multitude of ways we could have done it a particular way and that that had tax advantages yes your honor I mean we were has not been this court's decision in Perachi deals with the I would say the flip side of this transaction a shareholder who is making a contribution of parties subject to the lien and in those situations you can again have a tax liability with no economic benefit that was discussed in this court's decision in Owen but in Perachi the person was advised he was planning to he had insurance companies he had to put additional assets in to meet capitalization requirements the assets he had were some property which was subject to loan so if he had just contributed them in he would have been subject to the tax under 357 so what Mr. Perachi did is he put in a personal loan for about a million dollars and by putting in the loan he obtained additional basis and therefore did not have an excess of the loan amount over the basis but that was clearly a planning of the way in which he was going to accomplish the transaction and this court affirmed that he was entitled to do that and I think that should be the same result here thank you I have three hopefully quick points I'd like to make in rebuttal first of all the proposition that the taxpayer did not need a business purpose for the basis bump transaction as opposed to the overall acquisition of Creedmoor conflicts with the tax court's finding that and this is on page six in the record that KPMG advised CMAQ senior management that successful execution of the plan would require a business purpose and would allow petitioner to deduct a significant loss and by plan they meant the plan the proposed advanced purchase of Creedmoor inventory this court has addressed that specific issue in a case that predated this transaction the Shulman case which from 1987 which we cite in our reply brief in that case a taxpayer engaged in a real real estate investment but in doing so chose to finance it in a method that create created a tax benefit in that transaction the court said lacked economic substance and the court rejected the argument that the mere fact that the real estate investment itself had economic substance immunized the goes back to Gregory 1930 35 case from the Supreme Court the taxpayer in that case had a legitimate transaction had an asset that had appreciated wanted to sell it decided to save a little bit on taxes by creating a valid corporation to run the asset through in the court said no the Supreme Court said no there was no economic reason for creating that corporation we're going to disregard disregard that for tax purposes number two the courts the sale to courts it was a paper sale they never got the property they couldn't get the property and use it under the bailment agreement but even if they did and even if they used it it's an insignificant benefit compared to the tax loss this case an insignificant economic benefit cannot breathe life into a transaction otherwise lacks economic substance the salad case is a great example of that there was a 20 million dollar artificial loss and five hundred thousand dollar economic gain in the court said this transaction was generating artificial loss does not pass semester and finally with regard to the loan to network wasn't just 42 million dollars the stipulation this case we've cited this in our brief it's on page 209 the excerpts of record the other sub loan 60 million to network network could have bought it this transferring inventory to network does not in any way explain the basis bump transaction doesn't explain why there was an advance purchase doesn't explain why this inventory was burdened by the debt and why it was transferred through Canada thank you thank you thank you for your oral arguments this morning the case is now submitted
judges: Fletcher, Hawkins, Murguia